UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 18, 2010

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHRISTINE ARAKELIAN, :
:
                       Plaintiff, :       09 Civ. 8070 (PAC)
:
       - against - :       <u>MEMORANDUM</u>
:       <u>OPINION & ORDER</u>
OMNICARE, INC., :
:
                      Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

       Plaintiff Christine Arakelian ("Arakelian") brings this action against her former employer, Defendant Omnicare, Inc. ("Omnicare"), asserting claims for breach of contract, violation of the Maryland Wage Payment and Collection Law ("Maryland Wage Payment Act" or "Act"), Md. Code Ann., Lab.. & Empl. §§ 3-501 to -509, and for a declaratory judgment. The dispute arises out of Omnicare's failure to provide Arakelian with severance benefits, and to pay her for unused vacation time, after she was discharged without cause in May, 2009. In addition to the value of the severance benefits and unused vacation time, Arakelian seeks to recover treble damages and attorney's fees under the Maryland Wage Payment Act. Arakelian also seeks a declaration that the non-compete and non-solicitation provisions in an agreement she entered into with Omnicare are unenforceable.

       Both parties move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, both motions are GRANTED in part and DENIED in part. Omnicare breached its contract with Arakelian when it failed to pay her severance benefits. Arakelian is not, however, entitled to severance in the amount she seeks because she waived her right to that amount by entering into a subsequent

agreement with Omnicare.  Omnicare did not breach its contract with Arakelian by failing to pay her for unused vacation time because Arakelian did not have any unused vacation time when her employment ended.  Further, Arakelian cannot recover under the Maryland Wage Payment Act because Maryland law does not apply.  Finally, the non-compete and non-solicitation provisions in Arakelian's agreement with Omnicare are unenforceable.

## Background

### I. Facts

NeighborCare, Inc. ("NeighborCare") offered Arakelian a position as one of its Vice Presidents for Business Development in May, 2005.  (Declaration of Christine Arakelian dated 10/26/2009 ("Arakelian Decl.") ¶ 2.)  NeighborCare is a Pennsylvania corporation, and when it extended the offer, its corporate headquarters were in Baltimore, Maryland.  (Affidavit of Tracy Finn dated October 26, 2009 ("Finn Aff.") ¶ 6; Arakelian Decl. ¶ 2.)  Arakelian was a resident of Virginia when she received the offer, and she has been a resident of Virginia ever since.  (Compl. ¶ 2; Ans. ¶ 2.)

The terms of NeighborCare's offer were set forth in a letter ("Offer Letter") dated May 11, 2005.  (Offer Letter, Declaration of Howard Scher ("Scher Decl."), Ex. A.)  The Offer Letter is signed by a NeighborCare executive, and at its outset states, "I am pleased to offer you the position of Vice President, Business Development with NeighborCare." (Id.)  After explaining that, should she accept, Arakelian will start her new job "on or about May 23, 2005," the Offer Letter details Arakelian's "basic employment information."  (Id.)  Under the heading "Your Position," the Offer Letter lists Arakelian's title and supervisor, and states that she will be working at NeighborCare's office in Baltimore.  (Id.)  Next to the term "Compensation," the Offer Letter provides:

> Salary: biweekly salary will be $5,961.54, which is $155,000 on an
> annualized basis.
> …
> Severance: In the event of a change in ownership through an acquisition
> by OmniCare, should your position be eliminated for reasons other than
> for cause, you will receive 9 months continuation of your current salary
> and medical benefits.  Should your position be eliminated for any other
> reason, other than for cause, you will receive 6 months continuation of
> your current salary and medical benefits.

(Id.)  The Offer Letter also states that Arakelian will "receive 4 weeks of vacation," and

requires Arakelian to sign and return a "non-compete and confidentiality agreement."

(Id.)

After setting forth the details of Arakelian's position, the Offer Letter explains

that "pay and benefit plans" are subject to change:

> As you know, in the ordinary course of business, pay and benefit plans
> evolve as laws, employee and/or business needs change.  Should it
> become necessary in the future to change any benefit or compensation
> plan currently in effect, these changes will apply to you as they do to all
> other eligible employees.

(Id.)  The Offer Letter also makes clear that NeighborCare was not offering Arakelian

employment for a specific period of time:

> While this letter is our commitment to employ you in the previous
> mentioned position, please understand that it does not constitute a contract
> or promise of employment for any specific length of time.

(Id.)

Arakelian accepted the position and signed the Offer Letter on May 16, 2005.

(Id.)  Her signature is found below the heading "Offer Acceptance," and after the phrase,

"I accept the position of Vice President, Business Development and the above terms and

conditions of employment."  (Id.)  While the Offer Letter is addressed to Arakelian at her

home in Virginia, Arakelian states that she signed the Offer Letter at NeighborCare's

corporate headquarters in Baltimore.  (Declaration of Christine Arakelian dated

11/16/2009 ("Arakelian Opp. Decl.") ¶ 2.)  As required by the Offer Letter, Arakelian also executed a Non-Competition and Confidentiality Agreement.  (Non-Compete and Confidentiality Agreement, Arakelian Decl., Ex. 1.)

After signing the Offer Letter, Arakelian went to work for NeighborCare at its headquarters in Baltimore.  (Arakelian Decl. ¶ 2.)  Arakelian's employment relationship with NeighborCare changed, however, soon after she commenced her duties as a Vice President for Business Development.  At the time of hiring, it was contemplated that Omnicare might purchase NeighborCare, (Offer Letter, Scher Decl., Ex. A; Defendant's Rule 56.1 Statement ("Def's Rule 56.1 Statement") ¶ 12; Plaintiff's Response to Def's Rule 56.1 Statement ("Pl's Rule 56.1 Resp.") ¶ 12), and Omnicare – which is a Delaware corporation, headquartered in Covington, Kentucky – did so on July 28, 2005.  (Def's Rule 56.1 Statement ¶ 12; Pl's Rule 56.1 Resp. ¶ 12; Finn Aff. ¶ 6.)

Following the acquisition, Omnicare closed NeighborCare's headquarters in Baltimore.  (Declaration of Christine Arakelian dated November 30, 2009 ("Arakelian Reply Decl.") ¶ 2; Finn Aff ¶ 10.)[1]  Arakelian, however, continued to work out of an Omnicare office in Baltimore until September, 2005, when she was given an office in an Omnicare pharmacy in her home state of Virginia.  (Finn. Aff. ¶ 11; Arakelian Reply. Decl. ¶ 2.)[2]  Arakelian worked from the pharmacy "for a period of some months," (Finn Aff. ¶ 12), and then began working from her home in Virginia.  (Id.)  She worked from her home in Virginia throughout the duration of her employment with Omnicare.  (Finn Aff. ¶ 13; Def's Rule 56.1 Statement ¶ 28; Pl's Rule 56.1 Resp. ¶ 28.)

---

[1] According to Omnicare executive Tracy Finn, NeighborCare's "corporate office was located in Maryland at the time Ms. Arakelian was hired, and it was changed to Covington, KY in 2006."  (Finn Aff. ¶ 6.)
[2] Arakelian explains that Omnicare continues to maintain an office in Baltimore.  (Arakelian Opp. Decl. ¶4.)

Two months after it acquired NeighborCare, on September 29, 2005, Omnicare adopted a "Severance Pay Plan." (Severance Pay Plan, Affidavit of Barbara Henderson dated October 22, 2009 ("Henderson Aff."), Ex. B.) The Severance Pay Plan's purpose is "to provide Eligible Employees . . . with severance benefits in the event of a Covered Termination of such employees." (Id. ¶ 1.2.) The term "Eligible Employee" is defined in paragraph 2.9 to mean,

> an Employee who (i) is employed by a Participating Company on the Effective Date and has worked for a Participating Company for at least six (6) consecutive months . . . and (ii) is either a salaried Employee working full time or an hourly Employee who customarily works at least twenty (20) hours per week for a participating company.

(Id. ¶ 2.9)[3] Certain employees are, however, expressly excluded from the definition of "Eligible Employee," including: "an employee who is party to an individual employment agreement or severance agreement that provides for rights or benefits upon a termination of employment." (Id. ¶ 2.9(iv).) While the Severance Pay Plan supersedes all earlier severance plans, it does not apply to "[a]ny Employee who is eligible to receive benefits under any . . . applicable law or contractual obligation of the Company or any Participating Company." (Id. ¶ 10.4.)

As to the substance of the Severance Pay Plan, employees with three or more years of service are eligible to receive severance pay amounting to one week of base pay per year of service. (Id. ¶ 4.2.) But whether an employee receives severance pay is entirely discretionary. (Id. ¶¶ 4.1, 4.4.) The plan administrator is empowered to pay an employee severance at the scheduled rate, above or below the scheduled rate, or not at all. (Id. ¶ 4.4.) Moreover, severance pay is expressly conditioned on the employee agreeing in writing to, among other things: (1) protect all confidential information; (2) waive all

---

[3] Participating companies include Omnicare and all of its wholly owned subsidiaries, such as NeighborCare. (Severance Pay Plan ¶¶ 2.13, 9.1, App. A, Henderson Aff., Ex. B.)

claims against Omnicare and its affiliates; and (3) comply with all additional requirements in "any employment letter or agreement or restrictive covenants agreement to which the Participant is a party." (Id. ¶ 5.1.)

In a letter dated May 9, 2006, Omnicare offered to enter into a retention bonus agreement (the "Retention Bonus Agreement") with Arakelian. (Retention Bonus Agreement, Scher Decl., Ex. B.) Pursuant to the offer, Omnicare would pay Arakelian a retention bonus of $23,250 in return for Arakelian's "agreement and compliance with the terms and conditions of this letter." (Id.) The letter states that by signing:

> You agree that the Retention Bonus shall be in full satisfaction of any and all rights that you may have to retention or similar bonuses from Omnicare or NeighborCare in connection with the acquisition and the combination of the businesses of Omnicare and NeighborCare, and waive any rights to claim any additional entitlement to retention or similar bonus payments. The foregoing does not effect your eligibility for any regular bonuses which may or may not be awarded to you in the future under an Omnicare bonus program, and will not be taken into account in any way when determining the amount, if any, payable under any other employee compensation of benefit program.

(Id.) The letter also provides that, in return for the bonus, Arakelian will execute and agree to the attached non-competition agreement. (Id.)

Arakelian agreed to the terms of the Retention Bonus Agreement and signed the letter on August 31, 2006. (Id.) She also signed a Restrictive Covenants Agreement which states that it is governed by New York law. (Restrictive Covenants Agreement ¶ 7, Scher Decl., Ex. B.) The "Noncompetition" and "Nonsolicitation" provisions of the Restrictive Covenants Agreement both apply to Arakelian for a period of twenty-four months following the termination of her employment. (Id. ¶¶ 2-3.) Pursuant to the Noncompetition provision ("Non-Compete Provision"), Arakelian is barred from competing with Omnicare anywhere in the continental United States. (Id. ¶ 2.) The Nonsolicitation provision ("Non-Solicit Provision") forbids Arakelian from soliciting any

of Omnicare's clients or employees.  (Id. ¶ 3.)   The Restrictive Covenants Agreement also contains a "Nondisclosure of Confidential Information" provision ("Nondisclosure Provision") which prohibits Arakelian from disclosing Omnicare's confidential business information.  (Id. ¶ 1.)

Omnicare's Vacation/Sick Day/Holiday Pay Policy ("Vacation Policy") was in effect when it acquired NeighborCare in July, 2005.  (Vacation Policy at 1, Henderson Aff., Ex. A.)  On January 1, 2007, Omnicare amended the Vacation Policy.  (Id.)  As amended, the Vacation Policy applies to all full time employees and provides that employees who have completed less than five years of service are entitled to a maximum of eighty hours of vacation time per year.  (Id. § I(A)-(B).)  Employees covered by the Vacation Policy earn vacation time on a per pay period basis.  (Id. § I(A).)  Arakelian, who was paid bi-weekly, requested seven days of vacation from her supervisor at Omnicare in March, 2009.  (Henderson Declaration dated November 30, 2009 ("Henderson Decl.") ¶ 8, 10.)  As evidenced by the Paid-Time-Off Request Form ("Vacation Request Form") submitted by Omnicare, Arakelian's request for vacation time was approved by her supervisor on March 27, 2009.  (Vacation Request Form, Henderson Decl., Ex. 1.)

Arakelian's employment with Omnicare was terminated without cause on May 12, 2009.  (Plaintiff's Rule 56.1 Statement ("Pl's Rule 56.1 Statement") ¶¶ 14-15; Defendant's Response to Pl's Rule 56.1 Statement ("Def's Rule 56.1 Resp.") ¶¶ 14-15.) Omnicare offered to pay Arakelian severance equal to six months of her base salary, if she complied with the requirements of the Severance Pay Plan and executed a Confidential Separation Agreement and General Release ("Separation Agreement"). (Finn Aff. ¶ 14; Separation Agreement, Finn Aff., Ex.A.)  Believing that she was entitled

to nine months of severance under the terms of the Offer Letter, Arakelian rejected Omnicare's offer and refused to sign the Separation Agreement.  (Arakelian Decl. ¶ 8; Finn Aff. ¶ 14.)  In light of Arakelian's refusal to sign the Separation Agreement, Omnicare did not pay her severance benefits.  (Finn Aff. ¶ 16.)

When her employment ended, Arakelian's annual salary was $180,000 and her medical benefits were worth $495 per month.  (Compl. ¶14; Ans. ¶ 14; Arakelian Decl. ¶ 8; Henderson Decl. ¶ 8.)[4]  In her affidavit, Arakelian states that she accrued fifteen vacation days prior to her termination and that Omnicare never reimbursed her for this unused vacation time.  (Arakelian Aff. ¶ 8.)  She values the fifteen days of vacation at $24,545, (id.), but the basis and method of calculation is not specified.  Further, Arakelian's valuation of her unused vacation time bears no relationship to her salary at the time she was terminated; fifteen days (three weeks) of salary at $180,000 per year is approximately $10,400.

Arakelian explains that she "unequivocally intend[s] to compete against Omnicare as soon as possible whether as an employee of a competitor or as an independent contractor."  (Arakelian Reply Decl. ¶ 4.)  She believes that the Restrictive Covenants Agreement has hindered her ability to find work and will continue to do so.  (Id.)  Indeed, when she interviewed for a job with an Omnicare competitor, "the interviewer expressed concern . . . about the Restrictive Covenants Agreement and the possibility of litigation with Omnicare if  . . . [she] were hired."  (Id.)  Moreover, Arakelian was offered a consulting position with one of Omnicare's competitors, and she intends to begin

---

[4] In its Answer, Omnicare denies the Complaint's allegation that Arakelian's medical benefits "had a monetary value of $495 per month."  (Compl. ¶ 15; Ans. ¶ 15.)  According to the Answer, the value of Omnicare's contribution to Arakelian's benefits was $469.22 per month.  (Ans. ¶ 15.)  Arakelian has, however, submitted an affidavit stating that her medical benefits were valued at $495 per month and Omnicare has not submitted any evidence to the contrary.

working for the competitor "in the near future" if she does not obtain full-time employment.  (Id.)

## II. Procedural History

Arakelian commenced this action in the New York Supreme Court for New York County on August 10, 2009.  On September 21, 2009, Omnicare removed the action to this Court.  Since the parties are diverse, and the amount in controversy exceeds $75,000, the Court is possessed of diversity jurisdiction and removal was proper. 28 U.S.C. § 1332, 1441(a).

Count I of the Complaint asserts a claim for breach of contract based on Omnicare's failure to pay Arakelian severance benefits in the amount set forth in the Offer Letter and its failure to pay Arakelian for fifteen days of unused vacation time. (Compl. ¶ 19.)   In Count II, Arakelian claims that she is entitled to treble damages and attorney's fees under the Maryland Wage Payment Act because Omnicare's failure to pay severance benefits and to compensate her for unused vacation time was "willful and unjustified."  (Id. ¶¶ 22-23.)  In Count III, Arakelian seeks a declaration that the Restrictive Covenants Agreement is void and unenforceable.  (Id. ¶ 30.)

Arakelian and Omnicare both filed motions for summary judgment on October 26, 2009, and the motions were fully briefed on November 30, 2009.

### Discussion

## III. Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The evidence on each material element must be sufficient to entitle the movant to relief as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations omitted), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(e).  The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

The same standard of review applies when the court is faced with cross-motions for summary judgment. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).  Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration. Id.

**IV. Beach of Contract[5]**

---

[5] While the parties offer conflicting choice of law analyses with regard to the Maryland Wage Payment Act claim, neither party offers a choice of law analysis with respect to the breach of contract claim.  In her briefing on the contract claim, Arakelian relies exclusively on New York law.  (Pl's Mem. in Supp. Mot. Sum. J. ("Pl's Mem. in Supp.") at 5-8; Pl's Reply Mem. in Further Supp. Mot Sum. J. ("Pl's Reply") at 2-6; Pl's Mem. in Opp. to Def's Mot Sum. J. at 3-6.)  Omnicare does not contest the applicability of New York law; instead, it asserts in a footnote that "we do not need to address the [choice of law] issue because the law of the various states uniformly requires a breach of a valid contractual obligation."  (Def's Mem. in Supp. Mot. Sum. J. ("Def's Mem. in Supp.") at 7 n.2; Def's Mem. in Opp to Mot. Sum. J. ("Def's Mem. in Opp.") at 7 n.2.)  In support of this assertion, Omnicare cites case law from New York, Virginia and Kentucky, but not Maryland.  (Id.)

    Inasmuch as Arakelian relies on New York law, and Omnicare does not object to the applicability of New York law, the Court is entitled apply New York law to the breach of contract claim.  Motorola

The elements of a breach of contract claim are: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Terwilliger v. Terwilliger, 206 F. 3d 240, 246 (2d Cir. 2000).[6]  To form a valid contract requires "an offer, acceptance, consideration, mutual assent and intent to be bound." Leibowitz v. Cornell Univ., 584 F.3d 487, 507 (2d Cir. 2009).[7]

Arakelian argues that by signing the May, 2005 Offer Letter, she entered into a valid contract with NeighborCare.  Two months after she entered into the contract, NeighborCare was acquired by Omnicare.  Approximately four years later, Omnicare terminated Arakelian without cause.  The Offer Letter states that "[i]n the event of a change in ownership through an acquisition by OmniCare, should your position be eliminated for reasons other than for cause, you will receive 9 months continuation of your current salary and medical benefits."  (Offer Letter, Scher Decl., Ex. A.)  Thus, according to Arakelian, Omnicare breached the Offer Letter when it failed to pay her severance in an amount equal to nine months of her salary and medical benefits.  (Pl's Mem. in Supp. at 5-8.)

---

Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) ("Here, the parties' briefs assume that New York law controls this issue, and such implied consent is sufficient to establish choice of law.") (internal quotation marks and ellipses omitted); Quanta Lines Ins. Co. v. Investors Capital Corp., No. 06 Civ. 4624(PLK), 2009 WL 4884096, at *7 (S.D.N.Y. Dec. 17, 2009) ("ICC has waived its choice of law argument by applying New York law in support of its claims throughout its briefing, but for 3.5 pages near the end of its opposition brief.").  Moreover, "the Court need not embark on a choice-of-law analysis in the absence of an 'actual conflict' between the applicable rules of . . . [the] relevant jurisdictions." DeBelasio v. Merrill Lynch & Co., No. 07 Civ. 318(RJS), 2009 WL 2242605, at *19 n.14 (S.D.N.Y.  July 27, 2009) (quoting Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005).  Neither party has shown that the potentially relevant contract law of Virginia, Maryland or Kentucky differs from that of New York. See Melnick v. Adelson-Melnick, 346 F. Supp. 2d 499, 506 n.39 (S.D.N.Y.  2004) ("As the parties have relied exclusively on New York cases and neither has referred to the law of Connecticut or any other state, much less shown that any such law differs from the law of New York, the Court applies New York law.")  Indeed, the relevant legal principles applicable to Arakelian's breach of contract claim are substantially the same in all four jurisdictions.  Thus, the Court will apply New York law to the breach of contract claim and, where appropriate, provide citations to the law of Virginia, Maryland and Kentucky.

[6] See also Sunrise Continuing Care, LLC v. Wright, 671 S.E.2d 132, 135 (Va. 2009); Sudamax Insustria e Comercio de Cigarros, LTDA v. Buttes & Ashes, Inc., 516 F. Supp. 2d 841, 845 (W.D. Ky. 2007); Taylor v. NationsBank, N.A., 776 A.2d 645, 652 (Md. 2001).

[7] See also Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 384 (Ky. 2002); Montagna v. Holday Inns, Inc. 269 S.E.2d 838, 844 (Va. 1980); Sheeskin v. Giant Food, Inc., 318 A.2d 874, 881 (Md. Ct. Spec. App. 1974).

For its part, Omicare argues that the Offer Letter is not a valid contract.  (Def's Reply Mem. at 4.)  According to Omnicare, it was not bound to pay Arakelian severance at the rate set forth in the Offer Letter since the Offer Letter states that "pay and benefit plans evolve" and that "[s]hould it become necessary in the future to change any benefit or compensation plan currently in effect, these changes will apply to you as they do to all other eligible employees."  (Offer Letter, Scher Decl., Ex. A.)  As Omnicare sees it, the severance "plan" applicable to Arakelian "evolve[d]" when Omnicare adopted the Severance Pay Plan on September 29, 2005.  (Def's Mem. in Supp. at 7-10.)  Even if the Severance Pay Plan did not apply to Arakelian, Omnicare contends that Arakelian waived her right to severance under the Offer Letter by entering into the Retention Bonus Agreement on August 31, 2006.  (Id. at 10-11.)

According to Omnicare, the Offer Letter "states that it is not an employment agreement."  (Def's Reply Mem. at 4.)  But this is not what the Offer Letter says.  The Offer Letter provides: "[w]hile this letter is our commitment to employ you in the previously mentioned position, please understand that it does not constitute a contract or promise of employment *for any specific length of time*."  (Offer Letter, Scher Decl., Ex. A.) (italics added).)  This phrase does not mean that the Offer Letter is not a contract; rather, it means that Arakelian will be an at-will employee "subject to discharge at any time."  Leibowitz v. Bank Leumi Trust Co. of N.Y., 152 A.D.2d 169, 174 (N.Y. App. Div. 2d Dep't 1989).  By signing the Offer Letter, Arakelian entered into a valid and enforceable contact with NeighborCare, albeit a valid and enforceable at-will employment contract.  See Broyles v. J.P. Morgan Chase & Co., No. 08 Civ. 3391(WHP), 2010 WL 815123, at *3 (S.D.N.Y. Mar. 8, 2010) ("However, reference to an employment at will policy does not bar the Offer Letter from operating as a valid

contract."); <u>JCS Controls, Inc. v. Stacey</u>, 57 A.D.3d 1372, 1373 (N.Y. App. Div. 4th Dep't 2008) ("We further agree with the [lower] court, however, that the terms set forth in the March 1998 employment agreement, which was signed by plaintiff's president, are binding on plaintiff [employer] despite defendant's [employee] status as an at-will employee."); <u>see</u> <u>generally</u> <u>Parker v. Columbia Pictures Indus</u>, 204 F.3d 326, 339 (2d Cir. 2000) ("In <u>Leonelli</u>, we rejected a defendant's argument that because the plaintiff was an at-will employee, he could not state a breach of contract claim for denial of benefits." (citing <u>Leonelli v. Pennwalt Corp.</u>, 887 F.2d 1195, 1196 (2d Cir. 1989)).[8]

"Case law dictates that when parties have an employment contract terminable at will, the contract can be modified and different compensation rates fixed without approval of the other party since the dissatisfied party has a right to leave his employment." <u>Gen. Elec.Technical Servs. Co. v. Clinton</u>, 173 A.D.2d 86, 88 (N.Y. App. Div. 3d Dep't 1991); <u>see</u> <u>Kronick v. L.P. Thebault Co.</u>, 70 A.D.3d 648, 648 (N.Y. App. Div. 2d Dep't 2010); <u>Int'l Paper Co. v. Suwyn</u>, 951 F. Supp. 445, 448 (S.D.N.Y. 1997). If an employer changes the terms of its employee's at-will employment contract "and the employee chooses to remain in the employer's employ after being advised of that change, the employee is deemed to have acquiesced to the new terms of employment and cannot later claim compensation based on the terms of the original contract." <u>In re Footstar, Inc.</u>, No. 04-22350(ASH), 2007 WL 1989290, at *5 (Bankr. S.D.N.Y. July 6, 2007); <u>see</u> <u>Plank v. Watson Bowman Acme Corp.</u>, 46 A.D.3d 1338, 1339 (N.Y. App. Div. 4th Dep't 2007); <u>Arrouet v. Brown Bros. Harriman & Co.</u>, No. 02 Civ. 9016(TPG), 2005 WL 646111, at *4 (S.D.N.Y. Mar. 18, 2005); <u>Dwyer v. Burlington Broadcasters Inc.</u>, 295

---

[8] <u>See also</u> <u>Spriggs v. Diamond Auto Glass</u>, 165 F.3d 1015, 1018-19 (4th Cir. 1999) (Maryland law); <u>Dodge v. CDW Gov't, Inc.</u>, No. 1:09cv528(AJT/IDD), 2009 WL 1605010, at *3-4 (E.D. Va. June 5, 2009); <u>Landrum v. Lindsey Wilson Coll.</u>, No. 2003-CA-000971-MR, 2004 WL 362317, at *3 (Ky. Ct. App. Jun. 9, 2004).

A.D.2d 745, 746 (N.Y. App. Div. 3d Dep't 2002).[9]  The question, therefore, is whether Omnicare effectively modified the terms of Arakelian's at-will employment contract by adopting the Severance Pay Plan.  If it did, then there was no breach of contract.  If it did not, then there is a question of whether Arakelian waived her right to severance under the Offer Letter by entering the Retention Bonus Agreement.  If she did, then there was no breach of contract.

As Arakelian stresses, the Severance Pay Plan applies only to "Eligible Employees."  (Severance Pay Plan ¶¶ 1.2, 2.9, 2.12, Henderson Aff. Ex. B.)  The definition of "Eligible Employee" expressly excludes "an employee who is party to an individual employment agreement or severance agreement that provides for rights or benefits upon a termination of employment."  (Id. ¶ 2.9(iv).)  Thus, by its terms, the Severance Pay Plan does not apply to Arakelian since the Offer Letter is an at-will "individual employment agreement."  Indeed, the Offer Letter also includes a "severance agreement."  Omincare contends that the Severance Pay Plan applied to Arakelian, and therefore modified the severance provision of the Offer Letter, because the "plain language" of the Offer Letter "states that it is not an employment agreement."  (Def's Reply at 4.)  But again, this is not what the Offer Letter says.  As explained, when Arakelian signed the Offer Letter on May 15, 2005, she entered into an at-will employment contract – i.e., "individual employment agreement" – with NeighborCare (and hence Omnicare).  In light of her "individual employment agreement" with Omnicare, Arakelian was not an "Eligible Employee" covered by the Severance Pay Plan.  As such, the Severance Pay Plan did not modify the terms of the Offer Letter, and

---

[9] See also Taraquini v. Superior Prods., Inc., No. JKB-05-3292, 2007 WL 763186, at *5-6 (D. Md. Mar. 12, 2007); Kimmel v. Progress Paint Mfg. Co., No. 2002-CA-000273-MR, 2003 WL 1226837, at *4 (Ky. Ct. App. Jan. 10, 2003); Smithson v. Juby, 32 Va. Cir. 412, 416 (Va. Cir. Ct. 1994).

Arakelian did not agree to a modification of the Offer Letter by remaining in Omnicare's employ following the adoption of the Severance Pay Plan.

The provision in the Offer Letter that reads "[s]hould it become necessary in the future to change any benefit or compensation plan currently in effect, these changes will apply to you as they do to all other eligible employees," (Offer Letter, Scher Decl., Ex. A), does not alter this conclusion.  The applicability of changes in a "benefit or compensation plan currently in effect" to Arakelian is contingent on Arakelian being amongst the "other eligible employee[s]" covered by the altered benefit or compensation plan.  (Id.)  Arakelian was not an "Eligible Employee" under the Severance Pay Plan because she was party to an "individual employment agreement."  (Severance Pay Plan ¶ 2.9(iv), Henderson Aff., Ex. B.)  In other words, the Offer Letter does not make the Severance Pay Plan applicable to Arakelian when the Severance Pay Plan itself says that it does not apply to Arakelian.

Omnicare also contends that Arakelian waived her right to severance benefits under the Offer Letter when she entered into the Retention Bonus Agreement in May, 2006.  (Def's Mem. in Supp. at 11.)  "[V]alid and enforceable rights under a contract may be waived by a subsequent writing. . . ."  Seven-Up Bottling Co. (Bangkok), Ltd. v. Pepsico, Inc., 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988).  A valid waiver requires "the voluntary and intentional abandonment of a known right which, but for the waiver would have been enforceable."  Golfo v. Kycia Assocs., 45 A.D.3d 531, 532 (N.Y. App. Div. 2d Dep't 2007).  The Second Circuit has cautioned that "[w]aiver of rights under a contract 'should not be lightly presumed.'"  Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 176 (2d Cir. 2006) (quoting Gilbert Frank Corp. v. Fed. Ins. Co., 520 N.E.2d

512, 514 (N.Y. 1988)).[10]  Like other contracts, the Offer Letter was not immutable or fixed for all time.  It could be changed.  The question is whether the parties agreed to change the terms of the Offer Letter by entering into Retention Bonus Agreement, and if they did agree to change the terms, what was the extent of the change.

By entering into the Retention Bonus Agreement, Arakelian agreed that her $23,250 retention bonus "shall be in full satisfaction of any and all right that you may have to retention or similar bonuses from Omnicare and NeighborCare in connection with the acquisition and the combination of the businesses of Omnicare and NeighborCare." (Retention Bonus Agreement, Scher Decl., Ex. B.).  She also agreed to "waive any rights to claim any additional entitlement to retention or similar bonus payments."  (Id.) Arakelian's entitlement to nine months of severance under the Offer letter is clearly "in connection with" Omnicare's acquisition of Neighborcare.  Indeed, Arakelian's entitlement to nine moths of severance under the Offer Letter is totally dependent on Omnicare acquiring NeighborCare.  The Offer Letter states that "[i]n the event of a *change in ownership through an acquisition by OmniCare*, should your position be eliminated for reasons other than for cause, you will receive 9 months continuation of your current salary and medical benefits."  (Offer Letter, Scher Decl., Ex. A (emphasis added).)

Arakelian argues that "retention or similar bonus payments" are not similar to severance pay, but that is a strained interpretation.  It is clear that the bonus offered to and accepted by Arakelian was in satisfaction of any benefit she might have derived from Omnicare's acquisition of NeighborCare.  Indeed, since the nine months of severance payable under the Offer Letter does not depend on Arakelian working for NeighborCare

---

[10] See also Gold Coast Mall v. Larmar Corp., 468 A.2d 91, 98 (Md. 1983); Bergbuller v. Minnick, 383 S.E.2d 722, 725 (Va. 1989); Bates v. Grain Dealers Nat'l Mut. Fire Ins. Co., 283 S.W.2d 3, 5 (Ky. 1955).

or Omnicare for any particular length of time, severance pay under the Offer Letter is akin to a "bonus." Cf. In re Applied Theory Corp., 312 B.R. 225, 240 (Bankr. S.D.N.Y. 2004) ("Unlike severance or vacation benefits geared to length of service – benefits that clearly constitute a part of an employee's wages for services rendered – the severance benefits here do not constitute any part of her compensation.  Whether she worked two minutes or thirty-five and one-half months after executing the Employment Agreement, she was entitled to in excess of $1.2 million if she were terminated without cause. . . . Her compensation for services rendered simply did not include severance pay." (quoting In re FBI Distribution Corp., 330 F.3d 36, 46-47 (1st Cir. 2003).)   Further, the Retention Bonus Agreement specifies not only satisfaction of "any and all right that you may have to retention or similar bonuses," but specifically identified that Arakelian was waiving any right she may have had "to claim any additional entitlement to retention or similar bonus payments" arising out of the acquisition.  (Retention Bonus Agreement, Scher Decl., Ex. B.)  In these circumstances, Arakelian knowingly and intentionally relinquished (i.e., waived) her right to nine months of severance under the Offer Letter by entering into the Retention Bonus Agreement and accepting the $23,250 retention bonus. See Golfo, 45 A.D.3d at 532.

Arakelian's right to severance under the Offer Letter is not, however, totally dependent upon Omnicare acquiring NeighborCare.  After setting forth Arakelian's entitlement to nine months of severance if NeighborCare is acquired by Omnicare, the Offer Letter states that "[s]hould your position be eliminated for any other reason, other than for cause, you will receive 6 months continuation of your current salary and medical benefits."  (Offer Letter, Scher Decl., Ex. A).  The waiver effected by the Retention Bonus Agreement is not so broad as to reach Arakelian's right to six months of

severance.  Waivers of contractual rights must be "clear and unambiguous."  United Air Lines, Inc. v. Austin Travel Corp., 681 F. Supp. 176, 190 (S.D.N.Y. 1988).  Since Arakelian's entitlement to six months of severance under the Offer Letter is in not "in connection with" Omnicare's acquisition of NeighborCare,  (Retention Bonus Agreement, Scher Decl., Ex. B.), Arakelian did not evince a clear intent to waive her right to six months of severance by entering into the Retention Bonus Agreement.  Arakelian, in effect, deleted the nine month severance provision from the Offer Letter when she entered into the Retention Bonus Agreement, leaving the six month severance provision as the only basis for her to receive severance pay.  Thus, the Retention Bonus Agreement limited – but did not extinguish – Arakelian's right to severance under the Offer Letter, and when Omnicare terminated Arakelian without cause she was entitled to "6 months continuation of . . . [her] salary and medical benefits."  (Offer Letter, Scher Decl., Ex. A).

Since the Severance Pay Plan did not modify Arakelian's right to severance benefits under the Offer Letter, and Arakelian did not waive her right to six months of severance benefits by entering into the Retention Bonus Agreement, Omnicare was contractually bound to pay Arakelian severance equal to six months of her salary and medical benefits when it terminated her employment without cause on May 12, 2009.  It did not, and therefore it breached its contract with Arakelian.  Thus, to the extent Arakelian moves for summary judgment on her breach of contract claim based on Omnicare's failure to pay severance benefits pursuant to the Offer Letter, the motion is GRANTED.  Omnicare's motion for summary judgment on the same issue is accordingly DENIED.

As to vacation time, Arakelian claims that Omnicare breached the Offer Letter by failing to pay her for fifteen days of unused vacation time.  (Compl. ¶ 19.)  Arakelian's declaration in support of her motion for summary judgment states that she accrued fifteen days of vacation time prior to her termination, but Arakelian has not submitted any evidence in support of this assertion.  (Arakelian Decl. ¶ 8.)  Omnicare argues that, at the time of her termination, Arakelian's entitlement to vacation time was controlled by the Vacation Policy; not the Offer Letter.  (Def's Mem. in Supp. at 4, 10; Def's Mem. in Opp. at 4, 10.)  The Vacation Policy – which applies to all full time employees – provides for eighty vacation hours per year for employees (such as Arakelian) who have worked for the company for less than five years.  (Vacation Policy § I(B), Henderson Aff., Ex. A.)  In support of its motion for summary judgment, Omnicare submitted the affidavit of its Compensation Manager, Barbara Henderson ("Henderson"), which states that "I have looked at the human resources records regarding Plaintiff Christine Arakelian, and at the time of her termination, she did not have any vacation hours due to her pursuant to Omnicare, Inc.'s vacation policy."  (Henderson Aff. ¶ 6.)

In her briefing on the motions for summary judgment, Arakelian does not argue that the Vacation Policy did not apply to her.  (Pl's Mem. in Supp. at 4; Pl's Mem. in Opp. at 6; Pl's Reply at 6-7.)  Nor does she contend that she was unaware of the Vacation Policy.  (Pl's Mem. in Supp. at 4; Pl's Mem. in Opp. at 6; Pl's Reply at 6-7.)  As previously noted, the Offer Letter was not immutable.  While the Offer Letter states that Arakelian will receive "4 weeks of vacation," (Offer Letter, Scher Decl., Ex. A), Omincare was entitled to, and did, modify the amount of vacation time provided for in the Offer Letter by adopting the Vacation Policy.  See Clinton, 173 A.D.2d at 88; Kronick, 70 A.D.3d at 648; Suwyn, 951 F. Supp. at 448.

Arakelian's only argument regarding her vacation time claim is that Henderson's affidavit "is classic hearsay and must be rejected." (Pl's Mem. in Opp. at 6; Pl's Reply at 6-7.) In response, Omnicare submitted the Vacation Request Form which shows that Arakelian took seven days of vacation in April, 2009. (Vacation Request Form, Henderson Decl., Ex. 1.)[11] Pursuant to the Vacation Policy, Arakelian had accrued approximately thirty hours of vacation time when she was discharged on May 11, 2009. (Henderson Decl. ¶ 9.)[12] As a full time employee, Arakelian worked at least thirty-two hours per week (6.4 hours per day). (Vacation Policy § I(A), Henderson Aff., Ex. A.) When her employment ended, Arakelian did not have any unused vacation time (7 days of vacation x 6.4 hours per work day = 44.8 hours of vacation time taken by Arakelian). Omnicare's motion for summary judgment on Arakelian's breach of contract claim seeking payment for unused vacation is GRANTED. Arakelian's motion for summary judgment on the same issue is accordingly DENIED.

## V. Maryland Wage Payment Act

The "primary purpose" of the Maryland Wage Payment Act is "to provide a vehicle for employees to collect, and incentive for employers to pay, back wages." Butler v. Visonair, Inc., 385 F. Supp. 2d 549, 555 (D. Md. 2005) (quoting Battaglia v. Clinical Perfusionists, 658 A.2d 680, 686 (Md. 1995)). The Act defines "employer" as "any person who employs an individual in the State or a successor of the person." Md. Code Ann. Lab. & Empl. § 3-501(b). Employers are required to pay employees "all wages due for work that the employee performed before termination of employment, on or before the day on which the employee would have been paid the wages if the

---

[11] The Vacation Request Form is admissible as a business record. See Fed. R. Evid. 803(6).

[12] Under the Vacation Policy, vacation time is accrued on a per pay period basis. (Vacation Policy § I(b), Henderson Aff., Ex. A.) Arakelian was paid bi-weekly and was entitled to eighty vacation hours per year. (Henderson Decl. ¶ 8.) From January 1, 2009 through the date of her termination in May, 2009, Arakelian could not have accrued more than 30.78 hours of vacation time.

employment had not been terminated." Id. § 3-505(a).  If the employer does not pay an employee back wages "after two weeks have elapsed from the date on which the employer is required to have paid the wage, the employee may bring an action against the employer to recover the unpaid wages." Id. § 3-507.1(a).

Pursuant to Section 3-507.1(b) of the Maryland Wage Payment Act, if a court finds that the employer withheld its employee's wages "not as a result of a bona fide dispute" then "the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." Id. § 3-507.1(b).  "What constitutes a 'bona fide dispute' . . . depends on the circumstances." Admiral Mortgage, Inc. v. Cooper, 745 A2d 1026, 1030 (Md. 2000). The focus is on,

> whether the party making or resisting the claim has a good faith basis for doing so, whether there is a legitimate dispute over the validity of the claim or the amount that is owing.  The issue is not whether a party acted fraudulently; fraud is certainly inconsistent with the notion of 'bona fide' or 'good faith,' but it is not required to establish an absence of good faith. The question, simply, is whether there was sufficient evidence adduced to permit a trier of fact to determine that [the employer] did not act in good faith when it refused to pay . . . [back wages to the employee] after he terminated his employment.

Medex v. McCabe, 811 A.2d 297, 306 (Md. 2002) (quoting Cooper, 745 A.2d at 1031). The "non-payment of severance pay . . . may be grounds for relief under the Act." Stevenson v. Branch Banking & Trust Corp., 861 A.2d 735, 738 (Md. Ct. Spec. App. 2004).

Arakelian contends that since there was no "bona fide dispute" over her right to severance benefits under the Offer Letter, Omnicare is liable for treble damages and attorney's fees under Section 3-507.1(b).  (Pl's Mem. in Supp. at 8-9; Pl's Mem. in Opp. at 6-7; Pl's Reply at 8-9.)  Omnicare argues that there was a bona fide dispute over severance pay, but its main argument is that the Maryland Wage Payment Act simply

does not apply.  Since the bulk of Arakelian's employment took place in Virginia, and the termination and refusal to pay took place there, Omnicare maintains that Arakelian cannot bring a wage claim under Maryland law.  (Def's Mem. in Supp. at 11-13; Def's Mem. in Opp. at 13-15; Def's Reply at 5-6.)

Whether Arakelian can seek recovery under the Maryland Wage Payment Act presents a choice-of-law question.  Federal courts sitting in diversity must apply the choice of law rules of the forum state, Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 582 (2d Cir. 2006), and therefore New York's choice-of-law rules are controlling.

"New York applies separate choice-of-law approaches to contract and tort claims."  Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 336 (2d Cir. 2005).  It is not entirely clear whether claims under Section 3-507.1(b) of the Maryland Wage Payment Act sound in contract or tort.  A Maryland federal court concluded that it is "more likely" that Section 3-507.1 claims sound in contract.  Yeibyo v. E-Park of DC, Inc., No. DKC 2007-1919, 2008 WL 182502, at *4 (D. Md. Jan. 18, 2008).  The appropriate classification of a claim for choice of law purposes is, however, determined by reference to the law of the forum.  See In re Ski Train Fire, 230 F. Supp. 2d 376, 389 (S.D.N.Y. 2002) ("the court must classify the conflicting laws by subject matter by reference to New York law (*e.g.*, tort or contract, substantive or procedural).");  Cont'l Oil Co. v. Gen. Am. Transp. Corp., 409 F. Supp. 288, 293 (S.D. Tex. 1976) ("A federal court in a diversity case must classify the action in accordance with the law of the forum.").  But there is no need to resolve whether Section 3-507.1(b) claims sound in contract or tort (or a hybrid of the two) because under New York's contract and tort choice of law rules, Maryland law does not apply.

"New York courts have adopted a flexible choice of law approach and 'seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." White Plains Coat & Apron Co. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006).  In contract cases "the 'center of gravity' or 'grouping of contacts' analysis is to be applied in choice of law situations."  Beth Israel, 448 F.3d at 583 (quoting In re Allstate Ins. Co. (Stolarz), 613 N.E.2d 936, 939 (N.Y. 1993)).  In applying the "center of gravity" or "grouping of contacts" analysis, courts are afforded latitude "to consider a 'spectrum of significant contacts.'" Globalnet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 383 (2d Cir. 2006) (quoting Stolarz, 613 N.E.2d at 939).  Relevant factors include "the place of contracting, negotiation and performance; the location of the subject matter of the contract; the domicile of the contracting parties."  Beth Israel, 448 F.3d at 583 (quoting Stolarz, 613 N.E.2d at 940).

With respect to employment contracts, "the matters of performance and breach are to be determined by the law of the place of performance, or, in the alternative, by the law of the state having the most significant contacts with the matter in dispute." Tischmann v. ITT/Sheraton Corp., 882 F. Supp. 1358, 1366 (S.D.N.Y. 1995) (quoting Fishberg v. Espirit De Corp., 778 F. Supp. 793, 801 (S.D.N.Y. 1991)); see Peters v. MCI Telecomms. Corp., 685 F. Supp. 411, 412 (S.D.N.Y. 1988).  At bottom, "when making a choice of law determination in contract cases, the jurisdiction having the greatest interest in the litigation will be applied and . . . the facts or contacts which gain relevancy in defining State interest are those which relate to the particular law in conflict."  Caribbean Const. Servs. & Assocs. v. Zurich Ins. Co., 267 A.D.2d 81, 83 (N.Y. App. Div. 1st Dep't 1999); see Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 607-08 (2d Cir. 2001).

Arakelian argues that Maryland law applies because she signed the Offer Letter at NeighborCare's then corporate headquarters in Baltimore and worked for NeighborCare and Omnicare in Baltimore for approximately four months.  (Pl's Mem. in Opp. at 6-7; Pl's Reply at 7-8.)   But after her four months working in Baltimore, Arakelian was transferred to Virginia where she worked continuously for Omnicare until her employment ended approximately three years and eight months later.  (Arakelian Reply Decl. ¶ 2; Finn Aff. ¶ 11.)  At all relevant times, Arakelian was a resident of Virginia. (Compl. ¶ 2; Ans. ¶ 2.)  Omnicare is a Delaware corporation headquartered in Covington, Kentucky.  (Finn Aff. ¶ 3.)  NeighborCare is a Pennsylvania corporation and its corporate headquarters were moved from Baltimore to Kentucky after Omnicare acquired it.  (Id. ¶ 6.)  Henderson explains that Arakelian's paychecks and benefits were calculated and managed in Kentucky.  (Henderson Decl. ¶ 4.)  And while it is not totally clear where the decision to deny Arakelian severance benefits was made, nothing suggests that the decision was made in Maryland.

Since Arakelian worked in Virginia for all but 8% of the time she was employed by Omnicare, the "place of performance" of her employment contract was, for all practical purposes, in Virginia. Tischmann, 882 F. Supp. at 1366.  Given the brevity of time Arakelian worked in Maryland, and the relative paucity of other significant contacts, Maryland's "interest in the litigation" is near zero.  Zurich Ins. Co., 267 A.D.2d at 83. The purpose of Section 3-507.1 of the Maryland Wage Payment Act is to ensure that Maryland employers pay wages after an employee is discharged.  Butler, 385 F. Supp. 2d at 555.  The "facts or contacts which gain relevancy," Zurich Ins. Co., 267 A.D.2d at 83, are therefore the facts and contacts Arakelian had with the State of Maryland when her employment ended.  When she was let go, Arakelian had essentially no relevant contacts

with Maryland, and she had not had any relevant contacts with Maryland for the preceding three years and eight months.  Under New York's "center of gravity" or "grouping of contacts" analysis, the Court concludes that Maryland law does not apply.

"The New York Court of Appeals has held that 'the relevant analytical approach to choice of law in tort action in New York' is the 'interest analysis.'"  Globalnet, 449 F.3d 377 (quoting Schultz v. Boy Scouts of Am., Inc., 480 N.E.2d 679, 684 (N.Y. 1985)).  Interest analysis is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation."  Lehman Bros., 414 F.3d at 337 (quoting Cooney v. Osgood Mach., Inc., 612 N.E.2d 277, 280 (N.Y. 1993)).  "Under this formulation, significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort."  Globalnet, 449 F.3d at 384 (quoting Schultz, 480 N.E.2d at 684).

Arakelian was discharged when she was working in Virginia; Omnicare refused to pay her severance in Virginia; and therefore the "tort occurred" in Virginia.  Cintas, 460 F.3d at 284.  Arakelian and Omnicare are, respectively, Virginia and Kentucky domiciliaries.  See DiTondo v. Meagher, 883 N.Y.S.2d 690, 695 (N.Y. Sup. Ct. Broome Cnty. 2009) ("It is well-settled that the domicile of a corporation for choice-of-law purposes is the state where it maintains its principal place of business." (collecting cases)).   Given that the locus of the tort is Virginia, and neither party is a Maryland domiciliary, under New York's "interest analysis" Maryland law does not apply.  Since Maryland law does not apply, Omnicare's motion for summary judgment on Arakelian's Maryland Wage Payment Act claim is GRANTED; Arakelian's motion for summary judgment is DENIED.

## VI. Declaratory Judgment

With certain inapplicable exceptions, the Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.  The permissive language of the Declaratory Judgment Act has been "consistently interpreted  . . . as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear."  Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003).  In determining whether to entertain a declaratory judgment action, "the Second Circuit has directed district courts to ask: '(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty.'"  Wachovia Bank Nat'l Ass'n v. EnCap Golf Holdings, LLC, 690 F. Supp. 2d 311, 327 (S.D.N.Y. 2010) (quoting Duane Reade Inc. v. St. Paul Fire & Marine Ins., 411 F.3d 384, 389 (2d Cir. 2005)).

Arakelian seeks a declaration that the Non-Compete and Non-Solicit Provisions of the Restrictive Covenants Agreement are void and unenforceable.  (Pl's Mem. in Supp. at 9-13; Pl's Mem. in Opp. at 7-10; Pl's Reply at 9-11.)[13]  The parties agree that the Restrictive Covenants Agreement is governed by New York law, (Restrictive Covenants Agreement § 7, Scher Decl., Ex. B), and Arakelian urges that New York courts will not enforce covenants not to compete when an employee has been discharged without cause.

---

[13] In her Complaint, Arakelian asks the Court to declare that the "Restrictive Covenants Agreement is void and unenforceable as a matter of law and that Plaintiff is not subject to any post-employment restrictions covenants in favor of Defendant."  (Compl. ¶ 30.)  Arakelian's argument in support of her motion for summary judgment makes clear, however, that she only challenges the enforceability of the Non-Compete and Non-Solicit Provisions of the Restrictive Covenants Agreement, and not the Restrictive Covenants Agreement *in toto*.  (Pl's Mem. in Supp. at 9-13; Pl's Mem. in Opp. at 7-10; Pl's Reply at 9-11.)  The Court accordingly takes no position on whether the Nondisclosure and other provisions of the Restrictive Covenants Agreement are enforceable.

(Pl's Mem. in Supp. at 9-10.)  Even if the Non-Compete and Non-Solicit Provisions are

enforceable, Arakelian contends that they are unreasonable in time and scope.  (Id. at 11-

12.)  Omnicare concedes, somewhat tepidly, that covenants not to compete are

unenforceable under New York law when an employee has been terminated without

cause.  (Def's Mem. in Opp. at 15 n.7; Def's Reply at 6-7.)  According to Omnicare,

Arakelian's declaratory judgment claim must nevertheless be dismissed because it is

unripe.  (Def's Mem. in Supp. at 14-16.)

 The ripeness doctrine "goes, in a fundamental way, to the existence of

jurisdiction," Simmonds v. I.N.S., 326 F3d 351, 357 (2d Cir. 2003), and "[a] party

seeking a declaratory judgment bears the burden of proving that the district court has

jurisdiction." Coggins v. Cnty. of Nassau, 615 F. Supp. 2d 11, 19 (E.D.N.Y. 2009)

(quoting E.R. Squibb & Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154, 177 (2d Cir. 2001).

"The standard for ripeness in a declaratory judgment action is that 'there is a substantial

controversy, between parties having adverse legal interests, of sufficient immediacy and

reality to warrant the issuance of a declaratory judgment.'"  Duane Reade, 411 F.3d at

388 (quoting Maryland Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)).

 While Omnicare argues that Arakelian's declaratory claim is unripe, Arakelian

maintains that she "unequivocally intends to compete against Omnicare as soon as

possible."  (Arakelian Reply Dec. ¶ 4.)  She has interviewed for a position with one of

Omnicare's competitors and that the interviewer expressed concern about the possibility

of litigation over the Restrictive Covenants Agreement if Arakelian were hired.  (Id.)

Furthermore, Arakelian has been offered a consulting position with an Omnicare

competitor, which she intends to accept "in the near future" if she does not find full time

work.  (Id.)

In light of Arakelian's declaration, Omnicare's reliance on <u>Accelecare Wound Ctrs. v. Bank of New York</u>, No 08 Civ. 8351(DLC), 2009 WL 2460987 (S.D.N.Y. Aug. 11, 2009) is misplaced.  In <u>Accelecare</u>, former employees of a company sought a declaratory judgment that a non-competition agreement was unenforceable.  <u>Id.</u> at *6. The Court dismissed the claim as unripe, but only because the employees "have announced no plans to even attempt to compete with Accelecare, nor does their pleading indicate that Accelecare plans to enforce it against them."  <u>Id.</u> at *7.   Here, by contrast, Arakelian has made clear that she intends to compete with Omnicare, has sought out employment with Omnicare competitors, and has been offered a position with one of Omnicare's competitors.

Omnicare's contention that "Plaintiff has failed to identify any facts that indicate that Omnicare plans to enforce the covenant against her," (Def's Reply at 6), is facetious. Omnicare's motion for summary judgment on Arakelian's declaratory judgment claim demonstrates its true intention.  And as Arakelian points out, Omnicare has refused to agree not to enforce the Restrictive Covenants Agreement, leaving her (and more importantly, any potential employer) uncertain as to whether she will be embroiled in a lawsuit if she accepts a position with an Omnicare competitor.  (Pl's Reply at 10 n.6.) Resolution of such uncertainty is one of the main purposes of declaratory judgments. <u>EnCap</u>, 690 F. Supp. 2d at 327.  Omnicare cannot move to dismiss Arakelian's claim; refuse to agree not to enforce the Restrictive Covenants Agreement; and at the same time claim that Arakelian has not shown that it intends to enforce the agreement.  Since Arakelian is actively seeking out employment with Omnicare competitors and has been offered a position with an Omnicare competitor, her declaratory judgment claim presents

an immediate and substantial controversy between parties with adverse legal interests and is ripe for adjudication.  See Duane Reade, 411 F.3d at 388.

New York courts "will not enforce a non-competition provision in an employment agreement where the former employee was involuntarily terminated."  SIFCO Indus., Inc. v. Advanced Plating Techs., Inc., 867 F. Supp. 155, 158 (S.D.N.Y. 1994); see Post v. Merrill Lynch, Piere, Fenner & Smith, Inc., 397 N.E.2d 358, 361 (N.Y. 1979).  "An essential aspect [of enforceable restraints on employee mobility] is the employer's continued willingness to employ the party covenanting not to compete."  SIFCO, 876 F. Supp. at 158 (quoting Post, 397 N.E.2d at 360).  Enforcing a noncompetition provision when the employee has been discharged without cause "would be 'unconscionable' because it would destroy the mutuality of obligation on which a covenant not to compete is based."  Morris v. Schroder Captial Mgmt. Int'l, 445 F.3d 525, 529-30 (2d Cir. 2006) (quoting Lucente v. IBM Corp., 310 F.3d 243, 254-55 (2d Cir. 2002)).  This rationale applies with equal force to covenants not to solicit a former employer's clients and employees; solicitation is simply a form of competition.  See Nissellson v. DeWitt Stern Group, Inc. (In re UFG Int'l, Inc.), 225 B.R. 51, 55-56 (S.D.N.Y. 1998) (Cedarbaum, J.)

The Restrictive Covenants Agreement is governed by New York law, Arakelian was terminated without cause, and therefore the Non-Compete and Non-Solicit Provisions are, as a matter of law, unenforceable.  Arakelian's motion for summary judgment on her declaratory judgment claim is GRANTED.  Omnicare's motion for summary judgment on the same claim is accordingly DENIED.

## Conclusion

For the foregoing reasons, Arakelian's motion for summary judgment is

GRANTED in part and DENIED in part. Omnicare's motion for summary judgment is

likewise GRANTED in part and DENIED in part. Specifically:

1)    Arakelian's motion for summary judgment on the breach of contract claim

is GRANTED to the extent Omnicare breached the Offer Letter by failing

to pay Arakelian severance benefits equal to six months of her salary and

medical benefits, and is otherwise DENIED. Omnicare's motion for

summary judgment on the breach of contract claim is accordingly

GRANTED in part and DENIED in part.

2)    Omnicare's motion for summary judgment on the Maryland Wage

Payment Act claim is GRANTED. Arakelian's motion for summary

judgment on the Maryland Wage Payment Act claim is accordingly

DENIED.

3)    Arakelian's motion for summary judgment on the declaratory judgment

claim is GRANTED. Omnicare's motion for summary judgment on the

declaratory judgment claim is accordingly DENIED.

4)    It is DECLARED that the Non-Compete and Non-Solicit Provisions of the

Restrictive Covenants Agreement are void and unenforceable.

The Clerk of Court is directed to close the motions at docket numbers 11 and 16.

Dated: New York, New York
      August /8, 2010

SO ORDERED

Paul A. Crotty

PAUL A. CROTTY
United States District Judge

30